APPEL, Justice.
In this case, we consider whether a law enforcement officer, after making a valid traffic stop supported by reasonable suspicion that an offense may be being committed, must terminate the stop when the underlying reason for the stop is no longer present. For the reasons expressed below, we hold that under the search and seizure provision of article I, section 8 of the Iowa Constitution, the stop must end when reasonable suspicion is no longer present.
I. Factual and Procedural Background.
On the evening of August 18, 2014, Officer James Morris was parked along Highway 61 in Eldridge, Iowa, conducting random computer checks on the license plates of passing motorists to see if the vehicle was reported stolen or if there were outstanding warrants associated with the owner of the vehicle. His check of the license plate of a vehicle that passed him revealed that the female registered owner, Arvis Quinn, had a suspended driver’s license.
Because it was dark, Morris could not determine when the vehicle passed him whether the driver was male or female. Morris pulled the vehicle registered to Quinn over to investigate the possibility that Quinn was driving the vehicle while her license was under suspension. As Morris approached the vehicle, it was clear to Morris that the driver was male, not female.
Morris did not terminate the stop upon determining that Quinn was not the driver of the vehicle. Instead, Morris proceeded to ask the driver of the vehicle, Jayel Coleman, for his license; registration, and proof of insurance. Coleman did not produce a registration but did produce “an Iowa ID.” Coleman stated that he was driving a vehicle he had borrowed from his sister. At the time Morris made his requests, Morris no longer had reasonable suspicion that a traffic offense had been committed.
Based on Coleman’s identification, Morris determined that Coleman was driving while barred in violation of Iowa Code sections 321.555(1) and 321.561 (2013). He was so charged. Coleman filed a pretrial motion to suppress with the district court. The district .court denied the motion. After a bench- trial, Coleman was convicted of the offense.
Coleman appealed. We transferred the case to the court of appeals. The court of appeals affirmed the conviction. Coleman sought further review,.which we granted. For the reasons expressed below, we vacate the decision of the court of appeals and reverse the judgment of the district court.
*286 II. Standard of Review.
We review the district court’s denial of a motion to suppress on constitutional grounds de novo. State v. Tyler, 867 N.W.2d 136, 152 (Iowa 2015). In reviewing a search and seizure dispute under article I, section 8 of the Iowa Constitution, we construe the provision “in a broad and liberal spirit.” State v. Height, 117 Iowa 650, 657, 661, 91 N.W. 935, 937-88 (1902) (construing fundamental guarantees, like the right against self-incrimination, broadly and liberally). We strongly favor the warrant requirement, subject only to “jealously and carefully drawn exceptions.” State v. Strong, 493 N.W.2d 834, 836 (Iowa 1992); accord State v. Ochoa, 792 N.W.2d 260, 285 (Iowa 2010). In interpreting article I, section 8, we may look to federal caselaw, the caselaw of other states, the dissenting opinions of state and federal courts, and to secondary materials for their persuasive power. State v. Short, 851 N.W.2d 474, 481 (Iowa 2014).
III. Issue Preservation.
We must initially confront issue preservation. In the district court proceedings, Coleman did not identify either the Iowa or the Federal Constitution in support of his motion to suppress. Further, the district court, in its ruling, simply stated that the motion to suppress was denied.
On appeal, Coleman cites both article I, section 8 of the Iowa Constitution and the Fourth Amendment. Coleman essentially makes the same argument under both constitutional provisions—namely, that the seizure of Coleman could not be constitutionally extended once the underlying reason for the stop was resolved.
The State does not contest error preservation. In its briefing on appeal, the State recognizes that Coleman has made claims under article I, section 8 and the Fourth Amendment. Like Coleman, the State makes the same argument under both constitutional provisions. The State asserts that prolonging the stop to ask for a driver’s license, registration, and proof of insurance is permissible.
We find the state constitutional issue is minimally preserved. We have held that when a defendant in the trial court only identifies the Fourth Amendment as the basis for a search and seizure claim, the state constitutional claim has not been preserved at the district court. State v. Prusha, 874 N.W.2d 627, 630 (Iowa 2016).[1]
Here, however, the defendant did not identify either constitution in the trial court although it was apparent that he was raising a search and seizure claim. This raises a different preservation question than that presented in Prusha. We have said that when a party brings a constitutional claim but fails to identify whether the party is proceeding under the Iowa or the Federal Constitution, claims under both the Iowa and the Federal Constitutions are preserved. State v. Harrington, 805 N.W.2d 391, 393 n.3 (Iowa 2011); King v. State, 797 N.W.2d 565, 571 (Iowa 2011). The State impliedly recognized our prior caselaw by declining to challenge issue *287 preservation under the Iowa Constitution and addressing both claims. We adhere to the approach in Harrington and King.
On appeal, Coleman did not state the claim under the Iowa Constitution should be evaluated under a standard different than that employed by the United States Supreme Court in Fourth Amendment cases. Nonetheless, he makes only one argument on appeal, namely, that once reasonable suspicion for the original traffic stop was resolved, the State could not extend the stop by asking for Coleman’s driver’s license, registration, and insurance. It would elevate form over substance to declare that Coleman’s argument actually cannot be considered under the Iowa Constitution because he did not specifically state that he was asking the court to depart from uncertain federal law. In any event, we reserve the right to apply principles established in the federal caselaw in a fashion different from prevailing federal law. See, e.g., State v. Pals, 805 N.W.2d 767, 771-72 (Iowa 2011); State v. Bruegger, 773 N.W.2d 862, 883 (Iowa 2009). Under these circumstances, the argument Coleman specifically made and specifically asks us to resolve is preserved under the Iowa Constitution.
IY. Discussion.
A. Introduction. The question of whether an automobile stop may be extended to require production of documents may sound mundane, and even petty, but it is not. Thousands of persons drive upon the roadways daily. Further, the central purpose of constitutional provisions regarding search and seizure is to structure and limit the scope of police interference in the daily life of citizens. Generalized police discretion to engage in search and seizure is antithetical to search and seizure law. See Ochoa, 792 N.W.2d at 287.
Further, as we have noted previously, unlimited discretion to stop vehicles on the open road may give rise to allegations of racial discrimination, characterized by the descriptive phrase “driving while black.” See State v. Lyon, 862 N.W.2d 391, 397 (Iowa 2015); see also State v. Harrison, 846 N.W.2d 362, 371-72 (Iowa 2014) (Appel, J., dissenting); Pals, 805 N.W.2d at 772 n.2; David A. Harris, “Driving While Black” and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J. Crim. L. & Criminology 544, 546-47 (1997).
As noted in Pals, traffic stops have emerged as a major issue in search and seizure law. 805 N.W.2d at 772-73. The use of minor traffic violations as a springboard into consent searches has prompted charges of abuse and racial profiling. Id. at 772; see also Barbara C. Salken, The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses, 62 Temp. L. Rev. 221, 235-36 (1989).
Indeed, the cases dealing with automobile stops sometimes have a flavor of racial profiling. See State v. Diaz-Ruiz, 211 P.3d 836, 846 (Kan. Ct. App. 2009) (questioning credibility of officer because facts demonstrated trooper was motivated by a “desire to search the vehicle of these two Hispanic men”). As we said in Pals, we approach these issues with
due regard to the legitimate needs of law enforcement, but with a recognition that our constitutional limitations on searches and seizures by law enforcement protect fundamental values of liberty and human dignity and are a bulwark against arbitrary governmental intrusions into the lives of citizens.
805 N.W.2d at 773.
B. Scope of Issues. The parties do not dispute that stopping an automobile *288 and detaining its occupants is a seizure under article I, section 8 and the Fourth Amendment. See Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979). Further, the parties do not dispute that Morris initially had sufficient reasonable suspicion under both constitutions to initiate a traffic stop under the facts and circumstances of this case. Further, the parties do not dispute that once Morris determined that Coleman was a male, the reasonable suspicion that triggered the stop was no longer present. The narrow question here, which is strictly a legal question, is whether law enforcement may extend the traffic stop by asking for a driver’s license, vehicle registration, and proof of insurance.
C, Federal Caselaw Under the Fourth Amendment.
1. Analytic framework applicable to automobile stops. The United States Supreme Court has developed a framework for the evaluation of automobile stops under the Fourth Amendment. The foundation for analysis of an automobile stop is provided in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Although Terry did not involve an automobile stop, the Supreme Court has considered a routine traffic stop more analogous to a Terry stop than a formal arrest. See Knowles v. Iowa, 525 U.S. 113, 117, 119 S.Ct. 484, 488, 142 L.Ed.2d 492, 498 (1998); Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984).
The United States Supreme Court applied -Terry principles in the context of an automobile stop in Prouse, 440 U.S. at 648, 99 S.Ct. at 1391, 59 L.Ed.2d at 660. In Prouse, the Supreme Court considered the question of whether a law enforcement officer may perform a random traffic stop for the purpose of checking license and registration- when there is no probable cause or reasonable suspicion that any violation of law is occurring. Id. at 650, 99 S.Ct. at 1394, 59 L.Ed.2d at 665.
’The Prouse Court held that such random stops violated the Fourth Amendment. Id., at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673. While Prouse recognized the legitimacy of the state’s general interest in safety as advanced by license and registration requirements, the Prouse Court was “unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment.” Id. at 658-59, 99 S.Ct. at 1398-99, 59 L.Ed.2d at 670-71. According to the Prouse Court,
[W]e cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot cheek would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.
Id. at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672.
The United States Supreme Court refined the Prouse analysis in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In the plurality opinion in Royer, the Court emphasized that the scope of an investigatory stop “must be carefully tailored to its underlying justification” and “last no longer than is necessary to effectuate the purpose of the stop.” Id. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238. In Royer, the Supreme Court plurality emphasized that a person “may not be detained even momentarily without reasonable, objective grounds for doing so.” Id. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236 (emphasis added).
*289 The Supreme Court confronted another traffic-stop controversy in Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). In Caballes, the Supreme Court considered whether a dog sniff conducted during a lawful traffic stop violated the Fourth Amendment. Id. at 406-07, 125 S.Ct. at 836-37, 160 L.Ed.2d at 845-46. The Caballes Court concluded that it did not. Id. at 409, 125 S.Ct. at 838, 160 L.Ed.2d at 847. The Caballes Court viewed a dog sniff as “sui generis”—unique, in other words—because it revealed only the presence or absence of contraband and, therefore, was not a search. Id. Even if a dog sniff is not a search, the Caballes Court recognized “[a] seizure ... can become unlawful if it is prolonged beyond the time reasonably required to complete [the initial] mission.” Id. at 407, 125 S.Ct. at 837, 160 L.Ed.2d at 846. In Caballes, the Illinois Supreme Court had determined, as a matter of fact, that the duration of the stop was justified by the underlying traffic offense. Id. at 408, 125 S.Ct. at 837, 160 L.Ed.2d at 846-47. According to the Ca-balles Court, a dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment. Id. at 410, 125 S.Ct. at 838, 160 L.Ed.2d at 848.
Justices Souter and Ginsburg dissented. Justice Souter forcefully argued that a dog sniff was, in fact, a search just like thermal imaging equipment in Kyllo. Id. at 413, 125 S.Ct. at 840, 160 L.Ed.2d at 850 (Souter, J., dissenting) (citing Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). Such a search ancillary to a traffic stop, according to Justice Souter, must be supported by reasonable suspicion. Id. at 415, 125 S.Ct. at 841, 160 L.Ed.2d at 851. According to Justice Souter, to search for evidence unrelated to the reason for the detention amounts to an “open-sesame” for general searches that the Fourth Amendment was designed to prohibit. Id.
In her dissent, Justice Ginsburg emphasized that in Terry-type stops, the limitation related to the “scope” of the seizure was not limited to duration, but also to the manner in which it is conducted. Id. at 418, 125 S.Ct. at 843-44, 160 L.Ed.2d at 853-54 (Ginsburg, J., dissenting) (citing Terry, 392 U.S. at 1, 88 S.Ct. at 1868, 20 L.Ed.2d at 889). Justice Ginsburg thus did not find it dispositive that the length of the stop was not extended. Id. at 420, 125 S.Ct. at 844, 160 L.Ed.2d at 854-55.
Shortly after Caballes, the Supreme Court returned to the general topic of automobile seizures in Arizona v. Johnson, 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). In Johnson, the Supreme Court confronted the question of whether passengers in a lawfully stopped vehicle could be subject to a Terry-type pat-down. Id. at 326, 129 S.Ct. at 784, 172 L.Ed.2d at 700. The Supreme Court concluded that officers who conduct routine traffic stops may engage in pat-downs of a driver and any passenger upon reasonable suspicion that they are armed and dangerous. Id. at 332, 129 S.Ct. at 787, 172 L.Ed.2d at 703.
2. Federal caselaw applying Terry? Prouse-Royer principles to extended automobile stops. The United States Court of Appeals for the Tenth Circuit has led the way in considering several traffic-stop cases in which the stop was extended after the underlying purposes were resolved. A frequently cited case in the field is United States v. McSwain, 29 F.3d 558 (10th Cir. 1994). In McSwain, the sole purpose of a traffic stop was to verify the expiration date on a temporary registration sticker on the rear window of the vehicle. Id. at 559-60, Once the officer determined the temporary registration sticker remained *290 valid, the court held that “further detention of the vehicle to question [the defendant] about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop’s underlying justification.” Id. at 561.
McSwain thus drew a “sharp contrast” between a situation where a traffic violation “has occurred or is occurring” and one where the reasonable suspicion for the stop had been completely dispelled. Id. (quoting United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993)). Only in the later circumstance did the lawfulness of the seizure come to an end. Id. at 562.
In the next case, United States v. Edgerton, the Tenth Circuit again considered a case in which a vehicle was stopped because a temporary registration tag could not be read because of darkness. 438 F.3d 1043, 1044 (10th Cir. 2006). The Tenth Circuit held, however, that once the trooper was able to read the temporary tag, the trooper “as a matter of courtesy, should have explained to [the] Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration.” Id. at 1051.
A third Tenth Circuit. case is United States v. Pena-Montes, 589 F.3d 1048 (10th Cir. 2009). In that case, the Pena-Montes court confronted the familiar situation in which an officer pulled over a vehicle believing it lacked a license plate, only to discover that the vehicle had a proper “dealer tag.” Id. at 1049. In Pena-Montes, the officer did not end the stop at that point, but continued his investigative activities, questioning a passenger about his immigration status. Id. at 1051. After canvassing the facts, the Pena-Montes court concluded that no additional reasonable suspicion was present. Id. at 1058. In response to the government’s argument that it is reasonable for officers to enquire about dealer tags after a traffic stop even if they appeared lawful, the Pena-Montes court declared, “We decline to sign this blank check.” Id,
Finally, in United States v. Trestyn, the Tenth Circuit considered a similar case in which a vehicle was missing a front license plate, but displayed a rear license plate. 646 F.3d 732, 736 (10th Cir. 2011). As in the other cases, when approaching the vehicle, it became clear that the rear license plate satisfied all statutory requirements. Id. at 744. At that point, according to the Tenth Circuit, questions of the drivers about their travel plans and a request for their licenses “exceeded the scope of the stop’s underlying justification because ... [the officer] no longer had an objectively reasonable articulable suspicion that a traffic violation had occurred or was still occurring.” Id.
Another frequently cited case involving extended automobile searches is the Fifth Circuit case of United States v. Valadez, 267 F.3d 395 (5th Cir. 2001). In Valadez, an officer who passed a motorist traveling in the opposite direction believed the motorist was operating a vehicle with an expired vehicle registration and illegal window tinting and initiated a traffic stop. Id. at 396. When the officer approached the vehicle and spoke with the driver, Valadez, the registration issue was quickly resolved, but the window tinting issue remained. Id. The officer asked Valadez for his driver’s license and insurance card. Id. When he returned to his patrol car, the officer requested a criminal history check on Vala-dez. Id. While the background check was still in progress, the officer returned to Valadez’s vehicle with a window-tint meter and determined the windows were legal. Id.
But the officer did not terminate the encounter at this point. Id. Although'the purpose of the stop had been resolved, the *291 officer proceeded to ask Valadez if he had any weapons or drugs in the vehicle. Id. Valadez responded that he had a loaded pistol in the front seat of the car and a rifle in the trunk. Id. The officer removed the weapons from the car to run a check to determine if they were stolen. Id. The results of his background check indicated that Valadez had a criminal history but did not apparently indicate whether it involved misdemeanors or felonies. Id. The officer returned to Valadez’s vehicle and asked him whether he had a felony conviction. Id. Valadez responded that he was not sure, but that he might have a felony conviction. Id. After being transported to the station, Valadez’s prior conviction was confirmed as a felony. Id. at 397. He was subsequently charged with the crime and entered a conditional guilty verdict allowing him to contest an unfavorable suppression ruling. Id.
The Fifth Circuit reversed the district court’s denial of Valadez’s motion to suppress. Id. at 399. The Fifth Circuit noted that Valadez did not dispute the initial lawfulness of the stop. Id. at 398. But the Fifth Circuit reasoned that once the officer determined that the registration was valid and the window tinting was lawful, at that point he had no basis to continue the stop. Id. The Fifth Circuit emphasized the detention was lawful up until the purposes of the stop were resolved, but when those purposes were resolved, there was no lawful reason to detain Valadez. Id.
The Sixth Circuit considered the validity of an extension of a traffic stop in United States v. Jones, 479 Fed.Appx. 705 (6th Cir. 2012). In Jones, the Sixth Circuit held that a police officer exceeded the scope of a traffic stop for failure to display proper license plates when he detained the driver after he observed a lawful temporary tag in plain view. Id. at 712; see also United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995) (“Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.”).
The Second Circuit grappled with an automobile stop in United States v. Jenkins, 452 F.3d 207 (2d Cir. 2006). In Jenkins, the officers believed that the vehicle pulled over lacked appropriate license plates. Id. at 209. After the stop, the officer became aware of a temporary plate posed on the vehicle. Id. When the officers approached the vehicle to speak to the driver, however, they smelled marijuana. Id. A subsequent search turned up unlawfully possessed firearms. Id. at 210.
The fighting issue in Jenkins was whether the police acted lawfully after their concern about unlawful licensure had been resolved. Id. at 212-13. The defendant claimed that once the officers observed the temporary license plate they could proceed no further and were required simply to waive the motorist on. Id. at 211. The state contended that the officers could reasonably approach the driver to explain the reason for the stop. Id. The Second Circuit agreed, noting that in McSwain, the Tenth Circuit suggested in dictum that such a courtesy was not unlawful. Id. at 213.
A number of reported United States district court decisions follow the general approach of the Second, Fifth, Sixth, and Tenth Circuits. In United States v. Salinas, the United States district court considered a case where a stop was initiated because of suspicion of a violation of the Texas license plate display requirement. 665 F.Supp.2d 717, 718-19 (W.D. Tex. 2009). The district court noted that the officers could have determined even before they asked for the driver’s license and *292 proof of insurance that there was not a violation of the Texas license plate requirement. Id. at 721. Because “[t]hey did not encounter reasonable suspicion of an additional violation—driving without a license—until after his traffic stop for failure to display a front license plate should have ended,” the evidence should have been suppressed. Id.; see also United States v. Castro, 929 F.Supp.2d 1140, 1152 (D.N.M. 2013) (“[O]nce the officer’s suspicion that a traffic violation occurred is dispelled, prolonging the detention by retaining the defendant’s identification, questioning the defendant further, or waiting for the outcome of a computer check, even if the check is in progress, is improper and a violation of the Fourth Amendment.”).
In United States v. Smith, the United States district court considered whether a traffic stop could be extended in an obscured license plate case. 37 F.Supp.3d 806, 808 (M.D. La. 2014). The district court determined that once the license plate issue was resolved, there was no further basis to detain the driver. Id. at 813-14. In Smith, the roadside officer had received statements from another officer that the motorist was believed to be a member of a motorcycle gang and suspected drug dealer. Id. at 812-13. This alone, however, did not justify prolonging the search. Id. at 813. While the state argued that officer safety was involved, the court rejected the argument, noting among other things that the officers did not act as if they were in fear of their safety, did not conduct pat-downs of either occupant of the car prior to their eventual arrest, and did not isolate them out of the car in order to separate them from a potential weapon. Id.
Finally, a federal district court in Iowa considered a traffic-stop issue similar to that raised in this case. In United States v. Wise, Chief Judge Longstaff considered a prolonged detention after any potential reason for the stop—a question about temporary tags—had been resolved. 418 F.Supp.2d 1100, 1102 (S.D. Iowa 2006). Relying on Edgerton, Judge Longstaff concluded that the deputy unlawfully detained the defendants when they asked for identification and brought one of the defendants back to the police car, because his investigation was no longer related to the purpose of the stop. Id. at 1108.
The Eighth Circuit, however, has declined to follow the approach of the Fifth, Sixth, and Tenth Circuits. For example, in United States v. $404,905.00 of U.S. Currency, the Eighth Circuit held that additional detention for thirty seconds to two minutes after the traffic stop was complete was lawful. 182 F.3d 643, 649 (8th Cir. 1999), abrogated by Rodriguez v. United States, 575 U.S. -, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). The Eighth Circuit reasoned that a two-minute canine sniff was de minimus, noting, among other things the “strong interest in interdicting the flow of drugs on the nation’s highways.” Id.
3. The United States Supreme Court’s most recent foray into extended automobile stops: Rodriguez v. United States. The United States Supreme Court returned to the question of extended automobile stops in Rodriguez, 575 U.S. at -, 135 S.Ct. at 1609, 191 L.Ed.2d at 492. In that case, the Supreme Court confronted the issue of whether the Fourth Amendment allows a dog sniff to be conducted after the completion of a traffic stop. Id. at -, 135 S.Ct. at 1614, 191 L.Ed.2d at 498.
The Rodriguez Court concluded that the dog sniff in that case may have unlawfully extended the duration of the stop and ordered the issue of independent justification for the dog sniff to be heard on remand. Id. at -, 135 S.Ct. at 1616-17, 191 L.Ed.2d at 501. The Rodriguez Court observed that when making ,a traffic stop, *293 beyond determining whether to issue a ticket, an officer may engage in ordinary inquiries incident to the traffic stop, including “checking the driver’s license, determining whether there are outstanding warrants against the driver, and inspecting the automobile’s registration and proof of insurance.” Id. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499.
The Rodriguez Court, however, concluded that the stop may have extended beyond the circumstances justifying the stop and would thus be unlawful without additional reasonable suspicion. Id. at -, 135 S.Ct. at 1616-17, 191 L.Ed.2d at 501. Echoing Caballes, the Rodriguez Court emphasized a traffic stop prolonged beyond the “time reasonably required to complete [the stop’s] mission” is unlawful. Id. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 500 (quoting Caballes, 543 U.S. at 407, 125 S.Ct. at 837, 160 L.Ed.2d at 846). In Rodriguez, the Supreme Court specifically declined to follow the reasoning of the Eighth Circuit in $404,905.00 in U.S. Currency. Id. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499-501.
D. State Caselaw.
1. Majority approach under Fourth Amendment to stops extended after original purpose of stop resolved. A considerable number of states have considered the question of the validity of extended automobile stops. Most of them decide the issue under the Fourth Amendment, but a few have considered the issue under state constitutional provisions. Whether under the Fourth Amendment or under the state constitution, the majority of the cases have held that once the underlying reason for a traffic stop has been resolved, it cannot be lawfully extended.
For example, in State v. Diaz, the Florida Supreme Court considered a case in which an officer pulled over a motorist because he could not read the temporary tag on the top of the rear window. 850 So. 2d 435, 436 (Fla. 2003). Once the ear was pulled over and the officer approached it, the officer was able to read the tag and learned that nothing was improper, Id. Nonetheless, the officer walked up to the driver’s window and asked for the driver’s information. Id. The driver could not produce a proper license and was ultimately convicted of felony driving with a suspended license. Id.
The Florida Supreme Court concluded that the seizure had been unlawfully extended after the underlying purpose of the stop had been resolved. Id. at 440. According to strong words of the Florida Supreme Court: .
It would be dangerous precedent to. allow overzealous law enforcement officers to place in peril the principles of a free society by disregarding the protections afforded by the Fourth Amendment. To sanction further detention after an officer has clearly and unarguably satisfied the stated purpose for an initial stop would.be to permit standardless, unreasonable detentions and investigations.
Id. at 439.
The Colorado Supreme Court came to a similar conclusion in People v. Redinger, 906 P.2d 81, 85-86 (Colo. 1995) (en banc). The Redinger court confronted facts similar to those in Diaz. An officer pulled over a vehicle after the officer could not see a license plate or temporary sticker on the rear of the vehicle. Id. at 82. When approaching the stopped car, however, the officer could plainly see a valid temporary plate properly displayed on the rear window on the driver’s side. Id. The officer then approached the driver’s window, explained the reason for the stop, but then extended the stop by asking for driver’s license, registration, and proof of insurance. Id. When the driver removed a wal *294 let from his jacket pocket, a plastic bag containing a white powdery substance fell onto his leg. Id. The officer then directed the driver to step out of the car, seized the bag, and asked the driver to identify the contents. Id. The driver identified the substance as methamphetamine and was charged with a drug crime. Id.
The Colorado Supreme Court held that the extended search violated the Fourth Amendment. Id. at 86. According to the Colorado Supreme Court, when “the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens.” Id. 85-86. State appellate courts in Utah, Indiana, Kansas, Ohio, South Carolina, Texas, Maryland, and Washington have come to similar conclusions to the decision of the Florida Supreme Court in Diaz and the Colorado Supreme Court in Redinger under the Fourth Amendment. See Holly v. State, 918 N.E.2d 323, 326 (Ind. 2009); Diaz-Ruiz, 211 P.3d at 836; Ferris v. State, 355 Md. 356, 735 A.2d 491, 500 (1999); State v. Chatton, 11 Ohio St.3d 59, 463 N.E.2d 1237, 1240-41 (1984); State v. Pichardo, 367 S.C. 84, 623 S.E.2d 840, 852 (Ct. App. 2005); Davis v. State, 947 S.W.2d 240, 245-46 (Tex. Crim. App. 1997) (en banc); State v. Morris, 259 P.3d 116, 124 (Utah 2011); State v. DeArman, 54 Wash.App. 621, 774 P.2d 1247, 1249 (1989).
2. Cases refusing to allow extended stops under both Fourth Amendment and state constitutions. In some cases, however, state supreme courts have invalidated extended searches under both state and federal search and seizure constitutional provisions. In State v. Hayen, the South Dakota Supreme Court considered yet another case in which an officer stopped a motorist because he was unable to see the expiration date on the bottom of the temporary thirty-day dealer’s license. 751 N.W.2d 306, 307 (S.D. 2008). A box in the new pick-up truck obstructed the view of the bottom of the license when the officer followed the vehicle. Id. The officer, however, did not bother to look at the temporary license, but walked by and asked the motorist for driver’s license and proof of insurance. Id. After this initial contact, the officer stepped back, saw the expiration date on the license, and determined it to be valid. Id.
The officer continued the stop by returning to his patrol vehicle to run a warrant and license check. Id. at 308. The warrant check revealed an outstanding warrant for the driver’s arrest. Id. A search incident to arrest then revealed methamphetamine residue and drug paraphernalia in the driver’s coat pocket. Id. The state charged the driver with possession of a controlled drug or substance and possession of drug paraphernalia. Id. The defendant filed a motion to suppress. Id.
In Hayen, the South Dakota Supreme Court, citing McSwain, held that the detention exceeded the lawful investigative stop and that the fruits of prolonged detention were properly suppressed. Id. at 311. Without any further articulable suspicion of criminal activity, the extended detention violated Hayen’s federal and state constitutional rights. Id.
A similar case is presented in McGaughey v. State, 37 P.3d 130 (Okla. Crim. App. 2001). In McGaughey, an officer observed a vehicle pass by and believed that the taillights on the back of the truck were not working. Id. at 132. The officer pulled the vehicle over. Id. When approaching the vehicle, the officer could see that, in fact, the taillights were functioning properly. Id.
Notwithstanding the officer’s awareness of the functioning of the taillights, the *295 officer asked the driver to step out of the car and asked for his driver’s license. Id. at 132-83. The officer then continued to inspect the vehicle, observing a pistol in the driver’s side door pouch. Id. at 133. After determining the gun belonged to the driver and was loaded, the officer asked if the driver would mind if he searched the vehicle, and the driver responded “go ahead.” Id. The search revealed three bags of amphetamine between the two front seats. Id. The driver was then patted down and over $6000 in cash was seized and the driver arrested. Id. A later inventory search revealed more drugs and cash. Id.
The Oklahoma Criminal Court of Appeals held that the extended stop was unlawful. Id. at 141. According to the Oklahoma court,
Although an officer effecting a valid traffic stop can require a driver to exit his car, and produce his license, and can check the validity of the inspections sticker on that vehicle, an officer who realizes that his stop of a vehicle was mistaken—and who has no other cause for reasonable suspicion of the driver— has no authority to further detain the driver or his vehicle. The seizure becomes illegal at the point where its initial justification has ceased and no new justification has arisen.
Id. at 140-41. The Oklahoma court declared the search unlawful under both the search and seizure provision of article II, section 30 of the Oklahoma Constitution and the Fourth Amendment of the United States Constitution. Id. at 140.
3.Distinction between extended stop where underlying problem is resolved and ongoing investigation pursuant to valid stop. A number of court decisions differentiate between a situation in which the original purpose has been resolved and when the original purpose of the stop is a valid and ongoing concern. See McSwain, 29 F.3d at 561. When the purpose of the original stop remains valid, a number of courts have held that a request for driver’s license, insurance, and registration is not invalid as long as the stop is not unduly prolonged. See, e.g., Trestyn, 646 F.3d at 744; McGaughey, 37 P.3d at 140-41.
4. State court outliers. The state court cases, however, have not been unanimous. Other states have allowed a driver’s license check under circumstances similar to the facts presented here. As a general matter, these states hold that if the traffic stop was initially supported by reasonable suspicion, a request for driver’s license, registration, and insurance papers is permitted even after the problem that led to the initial stop has been resolved in favor of the driver. See, e.g., State v. Gulick, 759 A.2d 1085, 1090 (Me. 2000); Hart v. State, 235 S.W.3d 858, 861 (Tex. Ct. App. 2007); State v. Williams, 258 Wis.2d 395, 655 N.W.2d 462, 468 (Ct. App. 2002).
5. Posi-Rodriguez developments. After Rodriguez, it is noteworthy that one state supreme court changed its course, at least under the Fourth Amendment. In People v. Cummings, the Illinois Supreme Court suppressed evidence resulting from an extended automobile stop. 379 Ill.Dec. 397, 6 N.E.3d 725, 733-34 (Ill. 2014). The United States Supreme Court granted certiorari, vacated the judgment, and remanded the case to the Illinois Supreme Court for consideration in light of Rodriguez. Illinois v. Cummings, — U.S. -, -, 135 S.Ct. 1892, 1892, 191 L.Ed.2d 760, 760 (2015) (mem.).
On remand, the Illinois Supreme Court stated that in light of Rodriguez, a driver’s license request of a lawfully stopped driver is permissible irrespective of whether that request relates directly to the purposes of the stop. People v. Cummings, 399 Ill.Dec. 210, 46 N.E.3d 248, 253 (Ill. 2016). As a result, the Illinois Supreme Court reversed *296 a lower court’s suppression of the evidence. Id. Pointedly, the Illinois Supreme Court noted that the defendant did not raise a parallel claim under article I, section 6 of the Illinois Constitution. Id. at 250.
E. Iowa Caselaw.
1. The contours of State v. Jackson. In State v. Jackson, we considered a ease in which the defendant was stopped for lack of a license plate. 315 N.W.2d 766, 767 (Iowa 1982). Upon approaching the vehicle, the officer found the vehicle had a lawful properly displayed department of transportation paper plate. Id. After making that determination, the officer asked the driver if he had a valid driver’s license. Id. The driver did not produce a license and admitted that he was driving while his license was under suspension. Id.
The defendant was subsequently charged with driving while his license was under suspension in violation of Iowa Code section 321A.32. Id. The district court granted a motion to suppress on the ground that there was no “articulate and specific reason to believe criminal activity [was] afoot.” Id. The state appealed. Id.
On appeal, the state filed a short brief citing Prouse for the proposition that there is no requirement of articulable and reasonable suspicion to support a request for production of a driver’s license. See Appellant’s Br. in Jackson at 4-5. The reference to Prouse implies that the Fourth Amendment may have been in play. There is no mention at all of the Iowa Constitution in the state’s Jackson brief. The pro se defendant did not file a brief in the case and the state’s position was thus unresisted.
In a brief two-page conclusory opinion, we held that the initial stop was valid under Prouse, 440 U.S. at 648, 99 S.Ct. at 1391, 59 L.Ed.2d at 660. Jackson, 315 N.W.24 at 767. Citing only Iowa Code section 321.27 and no other authority, we further stated that “there was nothing illegal about the fact that, once he was stopped and exonerated, he was asked to display his operator’s license.” Id. This conclusion is stated, but perhaps because of the absence of a brief on behalf of the defendant, no reasoning is provided. Neither the Fourth Amendment nor the Iowa Constitution was mentioned in the opinion. See id.
Jackson was decided before the Supreme Court decided Royer. As noted by the court of appeals in this case, Jackson does not specifically address whether it is reasonable under the Fourth Amendment for the officer to prolong the detention of the motorist to demand his or her driver’s license. In addition, there is certainly no holding under article I, section 8 of the Iowa Constitution in Jackson.
2. Reemergence of independent state constitutional law. As has been thoroughly canvassed in some of our other opinions, the Iowa Supreme Court has a long history of independent adjudication of state constitutional issues. In recent decades, we have -reemphasized that independent constitutional tradition. In State v. Cline, we reexamined filaments in our prior law noting the ability of state courts to engage in independent constitutional analysis. 617 N.W.2d 277, 285 (Iowa 2000), overruled on other grounds by State v. Turner, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In Cline, we specifically declined to follow the approach of the United States Supreme Court in United States v. Leon, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677, 698 (1984). Id. at 293. Subsequent to Cline, we have engaged in independent state constitutional analysis in a number of search and seizure cases. See, e.g., Short, 851 N.W.2d at 481; State v. Baldon, 829 N.W.2d 785, 790-91 (Iowa 2013); Pals, 805 N.W.2d. at 775; Ochoa, 792 N.W.2d at 262; *297 State v. Tague, 676 N.W.2d 197, 206 (Iowa 2004).
3. Recent Iowa cases involving traffic stops. Since 2010, we have considered the legality of automobile stops in five cases. The first case is State v. Vance, 790 N.W.2d 775 (Iowa 2010). In Vance, we considered whether law enforcement had reasonable suspicion under the Fourth Amendment to stop a vehicle when the officers knew that the owner of the vehicle had a suspended driver’s license and when the officers had no evidence or circumstances indicating that the registered owner was not the driver of the vehicle. Id. at 781. Joining a majority of jurisdictions, we held that under these circumstances, the officers had reasonable suspicion to make an initial stop. Id. at 781-83. In a footnote, however, we noted that counsel for Vance failed to raise the question of whether the basis for the stop continued to be valid upon the officer’s discovery that the driver of the vehicle was not, in fact, the registered owner. Id. at 783 n.l. We also noted that counsel had failed to raise any claim that the stop was invalid under the Iowa Constitution. Id. at 780.
In Vance, we then proceeded to consider an Iowa constitutional claim that was preserved—namely, whether Vance’s counsel provided ineffective assistance of counsel for failing to challenge the search of his car under the Iowa Constitution. Id. at 786. In New York v. Belton, the Supreme Court held under the Fourth Amendment that
when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile [as well as] any containers found within the passenger compartment.
453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981) (footnotes omitted). In a 1981 case, State v. Sanders, we adopted Belton as the proper analysis under the Iowa Constitution. 312 N.W.2d 534, 539 (Iowa 1981), overruled by State v. Gaskins, 866 N.W.2d 1, 16 (Iowa 2015).
After Sanders and by the time of Vance, Belton had come under heavy attack as overbroad. As noted in Vance, academic commentators sharply criticized the decision, eight states declined to follow it under their state constitutions, and the Supreme Court itself began to question broad readings of the case in its subsequent opinion. 790 N.W.2d at 787-90. Further, at the time Vance was pending, the United States Supreme Court had granted certiorari in Arizona v. Gant, 552 U.S. 1230, 128 S.Ct. 1443, 170 L.Ed.2d 274 (2008) (mem.) (Cer-tiorari granted to answer the question: “Does the Fourth Amendment require law enforcement officers to demonstrate a threat to their safety or a need to preserve evidence related to a crime of arrest in order to justify a warrantless vehicular search incident to arrest conducted after the vehicle’s recent occupants have been arrested and secured?”).
Under these circumstances, we stated in Vance that we would ordinarily proceed to determine whether counsel violated professional norms by failing to challenge Sanders and Belton under the Iowa Constitution.' 790 N.W.2d at 789-90. We stopped short of finding counsel’s performance deficient on direct appeal, however, on the ground that it was possible that trial counsel failed to raise a challenge to Belton because trial counsel may have reasonably believed that there were other exceptions to the warrant requirement that would allow admissibility. Id. at 790. As a result, the matter was left for possible postconviction relief. Id,
In Vance, we did not, then, expressly hold that counsel had been ineffective for failing to challenge the search of the vehi *298 cle on Iowa constitutional grounds. However, there would have been nothing to leave for postconviction relief if Sanders and Belton remained good Iowa law.
Our next traffic-stop case is Pals, 805 N.W.2d at 767. The first issue in Pals was whether an officer could validly stop a vehicle for an ongoing civil infraction. Id. at 774. We concluded that such a stop was lawful under both the Fourth Amendment and the Iowa Constitution. Id. at 775. We next considered whether the scope of the search had unlawfully expanded after the initial valid stop. Id. We concluded, however, that the issue was not preserved in the district court and declined to address it. Id. at 776-77.
Finally, we considered whether a consent to the search was constitutionally sufficient. Id. at 777. We concluded that it was not. Id. While we recognized that many states had abandoned the United States Supreme Court’s “totality of circumstances” vegetable-blender approach to consent in the search and seizure context found in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in favor of the more rigorous knowing and voluntary approach of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), we determined that it was not necessary to reach that issue. Pals, 805 N.W.2d at 779. Instead, we determined, for the purpose of the case before us, to apply Schneckloth “with teeth” to invalidate the consent to search because of its coercive features. Id.
Our next automobile-stop case is State v. Tyler, 830 N.W.2d 288 (Iowa 2013). In Tyler, we considered a case where an officer made a traffic stop based on a mistake of law, namely, that a license plate cover unduly obstructed his view of the plate and was unlawful. Id. at 290. After making the initial stop, the officer detected the odor of alcohol on the driver’s breath. Id. at 291.
In considering the issues in Tyler, we examined a videotape of the stop which demonstrated that both the rear and front license plate covers were clear rather than tinted. Id. at 290-91. The officer who made the stop could plainly read the license plate as demonstrated by his call to dispatch providing the information. Id. at 291. The only claimed violation of law was a violation of Iowa Code section 321.37(3), which provided that any frame around the registration plate must permit full view of all numerals and letters printed on the plate. Id. at 294. We held that the statute was not violated and the officer had made a mistake of law in initiating the stop. Id. at 295-96. As a result, both the Fourth Amendment and the Iowa Constitution, article I, section 8 were violated.[2] Id. at 298.
We also noted there was evidence in the record indicating the officer has specifically targeted Tyler’s vehicle for a stop for a reason other than an obscure license plate. Id. at 297. A friend of Tyler’s with identical license plate covers passed by the officer without incident immediately prior to Tyler’s arrest. Id. We observed in a footnote that while Tyler—who was black— argued that he was a victim of racial profiling, we did not need to reach that particular issue in light of our resolution of the case. Id. at 297 n.4. We made the commonsense observation, however, that the possi *299 bility for racial profiling requires us to carefully review the objective basis for asserted justifications behind the traffic stops. Id.
The next case in our parade is Gaskins, 866 N.W.2d at 1. In Gaskins, an officer made a routine traffic stop for an expired license plate. Id. at 8. When the officer approached the vehicle, he smelled marijuana and confiscated a blunt from the driver. Id. A search of the passenger compartment of the vehicle revealed a small portable locked safe. Id. Police opened the safe without a warrant and discovered drugs, paraphernalia, and a gun. Id. We held that the search of the safe was unlawful under article I, section 8 of the Iowa Constitution. Id. In doing so, we specifically overruled Sanders, noting that it was no longer good law under the Iowa Constitution. Id. at 16.
The final case is In re Property Seized from Pardee, 872 N.W.2d 384 (Iowa 2015). Pardee involved a traffic stop that was prolonged by efforts to engage in a dog sniff for drugs. Id. at 385-86. In Pardee, we noted under the Fourth Amendment an officer “‘may conduct certain unrelated checks during an otherwise lawful traffic stop’ but ‘may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.’” 872 N.W.2d at 393 (emphasis added) (quoting Rodriguez, 575 U.S. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499).
F. Analysis. In developing the proper approach to the Iowa Constitution, we may look to United States Supreme Court opinions,' dissents in those opinions, various federal precedents, state court precedents, and any other persuasive authorities. See Short, 851 N.W.2d at 481; Ochoa, 792 N.W.2d at 264-67. Indeed, there is a healthy body of independent state constitutional law developing in the area of traffic stops. See Margaret M. Lawton, State Responses to the Whren Decision, 66 Case W. Res. L. Rev. 1039, 1046-54 (2015) (citing cases from Washington, New Mexico, and Alaska departing from the doctrine in Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), in which the United States Supreme Court unanimously held that traffic stops based on objective probable cause are reasonable regardless of the officers actual motivation for the stop).
We think the federal and state cases have some common themes. First, cabining official discretion to conduct searches is designed to prevent arbitrary use of police power. Limiting both the scope and duration of warrantless stops on the highway provides important means of fulfilling the constitutional purpose behind article I, section 8, namely, ensuring that government power is exercised in a carefully limited manner.
The caselaw repeatedly emphasizes that even de minimus extensions of traffic stops are not acceptable. The fountainhead case of the United States Supreme Court is Royer. It has been picked up in the caselaw with some enthusiasm. See United States v. Stepp, 680 F.3d 651, 663 (6th Cir. 2012) (finding six minutes measurably prolonged traffic stop); United States v. Dolson, 673 F.Supp.2d 842, 867 (D. Minn. 2009) (finding a delay of one minute and twenty-four seconds to call drug task force to be an unlawful extension).
That said, it is possible that when there is a valid ongoing traffic stop officers may properly seek driver’s identification, registration, and insurance information. This distinction is well recognized in the case-law. Here, however, there was no ongoing valid traffic stop.
We, of course, are not obliged to follow Rodriguez in our interpretation of article *300 I, section 8 of the Iowa Constitution. In any event, nothing in Rodriguez is to the contrary. In dicta, Justice Ginsberg indicates that obtaining driver’s license, registration, and insurance information is a normal part of an ordinary traffic stop. Rodriguez, 575 U.S. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499. But she was referring to a valid, ongoing stop, not a traffic stop in which the underlying reason for the stop has been satisfied. Early on, the McSwain case recognized the critical distinction between a case in which there is a violation or ongoing violation and one in which the basis for the stop has dissipated. 29 F.3d at 561. Other cases prior to Rodriguez emphasized the distinction as well. See, e.g., State v. Williams, 136 P.3d 579, 589 (N.M. Ct. App. 2006) (noting the state “ignore[d] the distinguishing fact in each case cited to support [its position]— the initial stop in each case was valid”); Hayen, 751 N.W.2d at 310 (distinguishing cases where actual traffic violation was present). A leading commentator on the Fourth Amendment emphasizes the distinction between a valid or ongoing investigation and one that has been resolved for purposes of records checks:
The importance of the violation of law to the authority to run a check on a license and registration is illustrated by those cases holding that if there is a stopping on either reasonable suspicion or probable cause of a traffic violation which is determined immediately after the stop not to have been a violation at all, the officer may not continue the detention for a license/registration check.
4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.3(c), at 510 n.162 (5th ed. 2012). Thus, the language used by Justice Ginsberg in Rodriguez does not suggest a different result is required in this case.
And even if it did, we would not be deterred from pursuing our own independent path under the Iowa Constitution. Although this case raises distinctive issues, our recent traffic-stop cases have evinced an awareness of the potential for arbitrary government action on the state’s roads and highways. In Vance, we severely questioned the rationale of our older precedent regarding searches of closed containers pursuant to an automobile stop in Sanders—a case we ultimately explicitly overruled in Gaskins. See Gaskins, 866 N.W.2d at 16; Vance, 790 N.W.2d at 787; Sanders, 312 N.W.2d at 539. In Pals, we put traffic stops in the larger context of concerns surrounding racial profiling. 805 N.W.2d at 772 n.2. That theme was continued in Tyler where we noted the stop involved an African-American driver in.which a previous driver with similar features on the license plate was not stopped. 830 N.W.2d at 297 & n.4. These recent cases all have a common feature of demanding compliance with Iowa constitutional commands in the traffic-stop context.
We recognize, however, that officer safety is a legitimate and weighty interest in the context of traffic stops. See Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 336-37 (1977) (per curiam). Yet, as the Supreme Court stated in Knowles, the safety concerns arising out of a potential traffic citation are “a good deal less than in the case of a custodial arrest.” 525 U.S. at 117, 119 S.Ct. at 487, 142 L.Ed.2d at 498. Nonetheless, in Mimms, the Supreme Court held that an officer can direct a driver to get out of the car to ensure the officer’s safety. 434 U.S. at 110-11, 98 S.Ct. at 333, 54 L.Ed.2d at 337.
Yet, for a more intrusive Terry-type stop, reasonable suspicion is constitutionally required before the officers may engage in a pat-down search. United *301 States v. Clark, 24 F.3d 299, 303 (D.C. Cir. 1994); United States v. Coley, 974 F.Supp. 41, 44 (D.C. Dist. 1997). There is no categorical approach to pat-down searches. The validity of a pat-down search, an important part of ensuring officer safety, depends upon the facts of each case. See Ramirez v. City of Buena Park, 560 F.3d 1012, 1022 (9th Cir. 2009) (rejecting Terry-type pat-down based on “conclusory references to ‘officer safety’ ”).
The same is true in the context of extending the duration of an automobile stop when the underlying problem has been resolved. While in most extended traffic-stop cases an officer safety claim has not been asserted, in cases where officer safety has been raised, the courts have repeatedly rejected generalized, unsubstantiated claims related to officer safety as a basis for extending a traffic stop. See, e.g., United States v. Henderson, 463 F.3d 27, 45-46 (1st Cir. 2006) (conclusory argument of officer safety not based on facts insufficient); Smith, 37 F.Supp.3d at 812-13 (insufficient evidence of threat to safety to justify extended stop); State v. McCaulley, 831 N.E.2d 474, 476-77 (Ohio Ct. App. 2005) (no safety reasons for detention of driver in back seat of squad car). Here, there is no indication in the record that the officer feared for his safety. Indeed, the officer allowed the unhandcuffed driver to accompany him back to the vehicle when the officer conducted the search.
Further, our holding does not increase the risks of harm to officers, but in fact lessens it. Under the result in this case, the officer is required to allow the driver to go on his or her way after the resolution of the reason for the stop. This can be accomplished by a brief gesture, an announcement from the back of the vehicle, or a brief conversation at the driver’s window. In this case, it would have simply only required the officer to say “good-bye” to the driver and allow him to return to the car. In fact, any increased officer danger arises from continuing the detention of the driver while the license and warrant checks are conducted. Thus, the very outcome . sought by the ■ State in this case would increase danger to officers, not lessen it. Officer safety might be a valid concern when tethered .to a suspect’s continuing detention, but not when the suspect is free to go. The State is not entitled to relief from an exigency of its own creation.
As indicated above, it is not clear whether Jackson was a Fourth Amendment or article I, section 8 case. In any event, to the extent that Jackson is inconsistent with our holding today, we overrule it. We conclude that when the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion, article I, section 8 of the Iowa Constitution requires that the driver must be allowed to go his or her way without further ado. .
, V. Conclusion.
For the above reasons, we conclude that the motion to suppress should have been granted. We therefore vacate the decision of the court of appeals and reverse the judgment of the district court.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.
All justices cbncur except Waterman, Mansfield, and Zager, JJ., who dissent.

. As in Prusha, counsel here does not make a claim for ineffective assistance of counsel in this appeal. When trial counsel fails to preserve an issue below, appellate counsel may, of course, on appeal assert a claim of ineffective assistance. State v. Thorndike, 860 N.W.2d 316, 319 (Iowa 2015). When the ineffective-assistance claim does not require further development of the factual record, we may decide the claim on direct appeal even though the underlying issue was not preserved in the trial court. Id. When the claim of ineffective assistance cannot be resolved on the record, however, we will decline to rule on direct .appeal and a party may file an action for postconviction relief where the record can be more fully developed. State v. Tate, 710 N.W.2d 237, 240 (Iowa 2006).

. After Tyler, the United States Supreme Court determined that a reasonable mistake of law could support reasonable suspicion for a traffic stop. Heien v. North Carolina, 574 U.S. -, -, 135 S.Ct. 530, 540, 190 L.Ed.2d 475, 486 (2014). Of course, the ruling in Tyler under the Iowa Constitution is unaffected by Heien. Further, the approach in Heien would be very difficult to square with our rejection of the good-faith exception to the exclusionary rule under article I, section 8 of the Iowa Constitution in Cline, 617 N.W.2d at 293.